IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| CHESTER JAKUBOWICZ, | ) | |
| DIANNA WALLEN, and | ) | |
| GLENDA WERLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-4135-CV-C-NKL |
| | ) | |
| RON DITTEMORE,[1] Director of | ) | |
| Missouri Department of Mental Health, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiffs Chester Jakubowicz, Dianna Wallen and Glenda Werley seek a permanent injunction against Ron Dittemore ("Dittemore"), the current Director of the Missouri Department of Mental Health ("DMH"). Plaintiffs claim that DMH's random, suspicionless drug testing policy is unconstitutional on its face and as applied to them and should be permanently enjoined.

Because Dittemore has failed to show a "special need" to drug test the Plaintiffs, their request for a permanent injunction, as to them, is granted. The Court, however, will not strike down the policy as facially unconstitutional because Defendant has shown that there is a special need to drug test some employees of DMH.

---

[1] When suit was originally filed, Dorn Schuffman ("Schuffman") was the Director of the Department of Mental Health. The new Director of the Department of Mental Health, Ron Dittemore, was substituted after Schuffman resigned.

1

**I.     Procedural Background**

Prior to the scheduled date for trial, the parties notified the Court that they wished to submit their evidence to the Court in writing. Therefore, the record before the Court consists of the depositions of Felix T. Vincenz, the Director of Facility Operations for DMH, and Linda Roebuck, the Deputy Director of DMH, as well as certain stipulations between the parties. Plaintiffs have also submitted Exhibit A which is a memo, dated April 6, 2005, from Schuffman to all DMH employees notifying them of the random drug testing program and Exhibit B, which is DMH's protocol for the drug testing.

**II.    Evidence**

DMH is a Missouri state agency that provides mental health services to thousands of Missouri residents. Plaintiff Chester Jakubowicz ("Jakubowicz") is a Psychiatric Assistant II for DMH at the Mid-Missouri Mental Health Center. Plaintiffs Glenda Werley ("Werley") and Dianna Wallen ("Wallen") are both Office Support Assistants at DMH's Southeast Missouri Mental Health Center.

Some of DMH's clients are treated on an out-patient basis and some are treated at in-patient facilities. There is no evidence that specifically describes either Mid-Mo Mental Health Center or Southeast Missouri Mental Health Center as residential or non-residential facilities. It is also not clear what population is served at Mid-Mo Mental Health Center and Southeast Missouri Mental Health Center, or the security level of those centers. Nor is there any evidence about the Plaintiffs' work environment at those facilities.

2

On April 6, 2005, Schuffman issued a letter to DMH employees notifying them about DMH's new drug testing plan. The letter states:

> In order to provide a safe and secure living environment for the people we serve and for those whom we work with on a daily basis, the [DMH] is implementing random drug testing in May 2005. All employees will be subject to random selection for testing.

*See* Pl. Brief [Doc. # 50] at Ex. A ("Ex. A"). The letter further states that the purpose of the policy was not to "catch" employees but rather to "ensure a safe and secure environment for employees and [to ensure] that we are providing the best care possible to those we serve." *Id.*

Under the policy, ten percent of the employees at each DMH facility are randomly selected for testing. If a selected employee refuses to submit, or tests positive, the employee will be placed on administrative leave pending further review. *See* Pl. Brief [Doc. # 50] at Ex. B ("Ex. B").

In addition to random drug testing, DMH's drug policy requires that employees submit to drug testing "when there is a reasonable suspicion that an employee is using, possessing, or distributing controlled substances either on or off duty, or when there is reasonable suspicion that an employee is impaired by alcohol or drug use while on duty." Ex. B.

The Department uses polygraphs to deal with allegations of abuse and neglect of its patients only when there is a reasonable suspicion of wrongdoing. The Department proactively addresses employee alcohol problems, but only if manifested in the

3

workplace, and addresses problems of family members bringing in drugs to secure facilities only if there is probable cause.

    B.    **Reasons for the Drug Testing Policy**

According to DMH, it developed its drug testing policy for two reasons: its belief that illicit drugs were being used by some DMH employees and its belief that each of its employees is a care giver and role model for clients of DMH and, therefore, must be drug free.

        1.    *Drug Use Among DMH Employees*

            a.    **Linda Roebuck**

Linda Roebuck ("Roebuck") is the Deputy Director of DMH and she has held that position since 2002. She began working for DMH in 1973 as a social worker.

Roebuck testified that she conducted a systemic review of Bellefontaine Habilitation Center in St. Louis, Marshall Habilitation Center in Marshall, and DMH's children's hospital in St. Louis after DMH clients were abused at those facilities. *See* Roebuck Dep. at p. 8, attached as Ex. 3 to Doc. # 51 ("Roebuck Dep."). It is the Court's understanding that these habilitation centers provide care to mentally retarded individuals, although this is not clear from the record. As part of her review, Roebuck allowed staff and family members of DMH clients to submit concerns to her confidentially. In her deposition, Roebuck states that at two habilitation centers:

> Staff came in both sites in particular, particularly the Marshall site, both sites, staff asked me if we had drug – random drug testing policies and strongly encouraged me that the [DMH] needed to implement such a policy.

4

> And they didn't describe anybody or any situation, but they did talk about the fact that they believed there were issues in the facilities and they believed it was difficult for staff sometimes to report it for fear of retaliation from other staff.

Roebuck Dep. at p. 9. Roebuck learned specifically that unnamed staff, including administrators, had been observed with drugs at the Marshall facility, but she "didn't try to pin them down because I was not there to investigate." *Id.* at p. 13.

Roebuck testified that family members of DMH clients also reported concerns about drug usage at the habilitation centers. She stated:

> Family members talked about the fact they felt there were concerns about potential drug use. And they also felt somewhat intimidated about reporting it because, again, their loved ones are going to be in the group homes, in the settings with very few staff, and there is kind of a natural tension, I think, about if they say so and so did something, how is everybody going to be treating their loved one and how are they going to be treated, so they were encouraging us to find ways that just didn't require individuals to report. I mean, they were all saying, you need the policy for individual reporting, but there are some factors out here that make it frightening for people to report.

*Id.* at p. 9.

Roebuck testified that, as she was preparing to leave the Marshall facility, she found an anonymous note on the windshield of her vehicle. Roebuck stated that the letter "indicat[ed] concerns about drug use and other issues of abuse and neglect. There were specifics in that letter, so I turned that over to our investigation unit. So I definitely had the experience of the staff and the family members encouraging us to do random drug testing." *Id.* at 10.

Roebuck also testified that DMH had found illicit drugs at two of DMH's

facilities. *Id.* at p. 11.[2]  According to Roebuck, "I can't remember the specifics, but they were on the campus and we didn't know, you know, as tightly as we monitor who gets on and off these campuses, it pretty much had to be staff or clients somehow involved with this." *Id.*

Since implementation of the Policy, Roebuck has not received any further reports about drugs at DMH facilities. Roebuck Dep. at p. 21.

### b. Dr. Felix Vincenz

Dr. Felix Vincenz ("Vincenz") is the Director of Facility Operations for DMH and he has worked for DMH since 1982. Vincenz testified that he had previously seen DMH employees bring illicit drugs into DMH facilities. He stated:

> In fact, in some instances of which I am personally aware, the individuals who brought substances into the wards were oftentimes the housekeeping staff. Not always, not routinely, but in many cases with which I am very familiar.

*See* Vincenz Dep. at p. 69. Because of DMH's new security measures at its custodial treatment centers, Dr. Vincenz concluded that DMH employees are the "primary vehicles" by which drugs are introduced into DMH's system. *See Id.* at p. 46. Dr. Vincenz provides no specifics about who was involved or when these incidents occurred or where these incidents occurred.

### 2. *DMH Employees as Role Models*

---

[2]Although it is not clear from Roebuck's deposition testimony, the drugs appear to have been found at Bellefontaine and Marshall.

Vincenz testified about the importance of DMH employees as role models for DMH clients. He stated that when a client knows or detects that a DMH employee is using drugs, and sees that DMH has done nothing about it, the client's treatment is undermined. This is particularly so because there is a power differential that exists between DMH employees and clients at in-patient facilities. DMH employees dictate client's schedules, clothing options, and other minutiae of the client's daily lives. Vincenz Dep. at pp. 31-32. "[I]f [staff] can [use drugs] and come to work and be the person telling me what to do, who are they to tell me I can't use it." *Id.* at p. 42.

He further explained that some DMH professionals were not as good at identifying drug use as some DMH clients. "Many of our consumers who use substances are very, very familiar with and very sophisticated in being able to detect substance use in other folks. I think sometimes even more so than many professionally trained clinicians." Vincenz Dep. at p. 19. Dr. Vincenz also testified that "the reality is that the cumulative usage of any of these substances can and does have an effect on individuals' behavior and judgment. . . . [A] single usage of marijuana typically produces only a period of intoxication. But if you routinely use any of these substances over time, behavior changes and judgment degrades . . . . What I'm saying is 'under the influence' is a subtle subject. You asked me earlier, 'Can someone test positive for marijuana and not be intoxicated?' The answer to that is yes. Can someone use marijuana routinely, not be intoxicated, but still have their behavior subtly altered? The answer to that, too, is yes. And what I'm saying is some of our consumers can detect that. . . . What I'm saying is

7

that the cumulative impact of using marijuana changes behavior; it changes cognition, it changes response time, it changes judgment, it changes emotionality, and that stuff is apparent not just to a consumer, but to that person's loved ones. But our consumers are pretty good at figuring that out." Vincenz Dep. at pp. 40-43. Dr. Vincenz contends that its consumers can perceive prior abuse of alcohol based upon these same observations. *Id.* at p. 43.

Vincenz also testified that DMH incorporates every employee into the treatment plan of DMH clients, regardless of the employee's level within the agency. Vincenz Dep. at p. 66. "[T]here is no distinction between patient care and non-patient care in any ultimate sense." Vincenz Dep at p. 65. He explained that DMH provides vocational rehabilitation activities for some of its clients, and those clients work alongside DMH employees, including administrative staff or housekeeping staff. Vincenz Dep. at p. 65.

Because some DMH clients have a special ability to detect drug use, and because some DMH clients work alongside DMH employees, Dr. Vincenz concludes that random drug testing of all DMH employees is needed. However, there is no evidence in the record that Jakubowicz, Wallen or Werley worked alongside DMH clients. Nor is there evidence of the background of DMH clients that were in contact with Jakubowicz, Wallen or Werley.

The parties agree that DMH's drug tests do not reflect current impairment and instead reflect past usage, including usage that occurred during non-working hours.

**III. Discussion**

The Fourth Amendment to the United States Constitution protects citizens from unreasonable searches. U.S. Const. amend. IV. The purpose of the Amendment is to protect "the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction," *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989).

When a governmental entity conducts urinary drug tests, those tests are considered searches under the Fourth Amendment that ordinarily would require a search warrant based on probable cause. *Skinner*, 489 U.S. at 616 ("[I]t is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable."); *McDonell v. Hunter*, 809 F.2d 1302, 1307 (8th Cir. 1987) ("We agree with those courts which have held that urinalysis is a search and seizure within the meaning of the Fourth Amendment."). Individualized suspicion and probable cause, however, are not necessary when a government's search is based on special needs, beyond the normal need for law enforcement. *Chandler v. Miller,* 520 U.S. 305, 313 (1997); *City of Indianapolis v. Edmond*, 531 U.S. 32, 36 (2000) (citation omitted).

When a governmental entity alleges a "special need"--as DMH alleges here-- "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler*, 520 U.S. at 314. "The special need for drug testing must be substantial--important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 318. In special

9

needs cases, courts employ a balancing test that considers the nature of the privacy interest, the character of the intrusion, and the nature and immediacy of the government's interest. *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 829-33 (2002).

The burden of proving whether an employee falls within this special needs exception to the Fourth Amendment falls on the governmental agency seeking to conduct the testing. *Neumeyer v. Beard*, 421 F.3d 210, 214 (3rd Cir. 2005) ("the government must prove . . . that its search meets a general test of 'reasonableness'"); *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1058 (7th Cir. 2000) ("the government must show a 'special need,' beyond the normal need for law enforcement, that makes the warrant and probable cause requirement impracticable"); *19 Solid Waste Dep't Mechanics v. City of Albuquerque*, 156 F.3d 1068, 1073 (10th Cir. 1998) ("the government must also be able to show, as a threshold matter, that its case for suspicionless testing is legitimate"); *Bell v. Manson*, 590 F.2d 1224, 1226 (2nd Cir. 1978) (government carries the burden of demonstrating a special need). *See also MacWade v. Kelly*, No. 05-CIV-6921, 2005 WL 3338573 at *16 (S.D.N.Y. Dec. 7, 2005) (government bears burden of producing evidence of special need); *Baron v. City of Hollywood*, 93 F. Supp.2d 1337, 1342 (S.D. Fla. 2000) ("the city cannot meet its burden of showing a 'special need'"); *O'Neill v. Louisiana*, 61 F. Supp.2d 485, 497 (E.D. La. 1998) ("the burden falls on [the government] to demonstrate that there exist some 'special needs,' beyond the normal needs of law enforcement").

10

Case 2:05-cv-04135-NKL   Document 59   Filed 09/12/06   Page 10 of 20

This allocation is consistent with the requirement in criminal cases that the government must demonstrate the existence of an exception to the Fourth Amendment's warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) (government has the burden of proving exception to the warrant requirement); *United States v. Portales*, 52 Fed. Appx. 290 (7th Cir. 2002); *United States v. Carhee*, 27 F.3d 1493, 1496 n. 2 (10th Cir. 1994) (collecting cases); *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983); *United States v. Kane*, 637 F.2d 974, 979 (3rd Cir. 1981) (government bears burden of proof in demonstrating exigent circumstances); *United States v. Dugger*, 603 F.2d 97, 99 (9th Cir. 1979); *Johnson v. Havener*, 534 F.2d 1232, 1234-35 (6th Cir. 1976); *United States v. Goldenstein*, 456 F.2d 1006, 1009 (8th Cir. 1972).

Because the special needs exception to the Fourth Amendment is context specific, the Court will consider separately the two justifications for DMH's random drug testing policy.

### A. Safety Sensitive Positions

Courts have applied the special needs doctrine to uphold random drug testing of occupations that provide services to the public and are deemed "safety sensitive." *Skinner*, 489 U.S. at 628 (Suspicionless drug testing after an accident was permissible because railway workers are in safety sensitive positions where they "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences").

11

In *Int'l Union v. Winters*, 385 F.3d 1003 (6th Cir. 2004), *cert. denied, Int'l Union v. Fink*, 544 U.S. 1017 (2005), the court applied the safety sensitive component of the special needs doctrine to uphold a random urinalysis drug testing program for several categories of Michigan state employees. The relevant employees at issue fell into three groups: those who provided health care to patients at state-run hospitals for the mentally ill and developmentally disabled; those who provided medical care to prisoners; and those who had direct unsupervised contact with the patients and/or inmates.

In upholding the Michigan drug testing program, the court noted that the medical care providers

> have direct patient care responsibilities in state facilities and have access to medications, including controlled substances. An employee involved in substance abuse might succumb to the temptation to take wrongful advantage of his or her access to these controlled substances . . . . [T]here is a risk of harm to the patient if a care giving employee is under the influence of drugs or alcohol.

*Id.* at 1010. The court concluded that Michigan's drug testing program was "based on substantial, and not merely hypothetical, public safety concerns" and upheld its validity under the Fourth Amendment. *Id.* at 1012.

The court in *Winters* also considered the fact that the employees at issue enjoyed a diminished expectation of privacy by virtue of their participation in a heavily regulated industry, the health care industry. The court stated, "[T]hose employees who provide healthcare and other services to prisoners and patients of state run facilities are also subject to comprehensive regulations." *Winters*, 385 F.3d at 1012. Thus, the court held

12

that because of that diminished expectation of privacy, the random drug testing program did not offend the Fourth Amendment. *Skinner*, 489 U.S. at 627 (noting that railroad employees have a diminished expectation of privacy because they participate in a pervasively regulated industry).

In *Pierce v. Smith*, 117 F.3d 866 (5th Cir. 1997), the court found that a medical resident in an emergency room setting was a safety sensitive employee and that the warrantless drug test imposed upon her was "plainly" within the special needs doctrine because "even a momentary lapse of attention can have disastrous consequences." *Id.* at 874 (citation omitted).

Similarly, in *Piroglu v. Coleman*, 25 F.3d 1098 (D.C. Cir. 1994), the court found that the District of Columbia had a compelling interest in conducting random drug screenings of its emergency medical technician trainees. The court stated:

> Given the nature of his duties, an EMT under the influence of drugs poses a real and substantial risk to public health and safety. The District's ability to protect the public through preventive drug screening of its EMT trainees would be greatly frustrated if it first had to obtain a warrant; a trainee who uses drugs could complete the training program without exhibiting symptoms of probable drug use only to become an EMT and pose a significant danger to the public safety.

*Id.* at 1102-03. The court held that, because of the inherent safety requirements associated with being an EMT who serves the public, the District of Columbia could conduct random drug screenings under the special needs doctrine.

A different court reached the same conclusion in *Am. Fed'n of Gov't Employees, L-2110 v. Derwinski*, 777 F. Supp. 1493 (N.D. Cal. 1991). The court found that

13

employees of a Veterans Administration ("VA") hospital were properly subject to random drug testing. Specifically, the court found that random drug testing was appropriate for "health professionals who are responsible for direct patient care, either with direct patient contact or in the performance of diagnostic testing or therapeutic functions or the preparation and dissemination of drugs and medicines." *Id.* at 1498. Noting the important public policy of ensuring that medical care providers are not impaired, the court stated:

> The maintenance of professional and personal integrity in the execution of their mission, the care and treatment of inpatients and outpatients, is of compelling concern. The paramount consideration of safety of members of the public who are eligible to use Veterans Administration hospitals and facilities is apparent on its face. Hospitals must exist precisely for that purpose. The gravity of the responsibilities of such medical professionals is at least as great as that of locomotive engineers, flight attendants, and pipeline workers, and the risks associated with drug-impaired performance equally catastrophic. Random drug testing, as compared with other forms of testing, offers the best potential deterrent to drug use. This factor, coupled with the possibility of catastrophic accident, is sufficient to show a strong governmental interest in random testing.

*Id.* at 1498. Thus, the court held that random drug testing was reasonable as applied to employees who were responsible for patient care, either directly or indirectly. However, the court held that random drug screening was unconstitutional as to several other categories of employees who were not responsible for patient care, including pipefitters, pest controllers, several types of mechanics and operators, and electricians.

### 1. Habilitation Centers

Defendant has persuaded the Court that there is a special need for random drug

14

testing at its habilitation centers. Most of the patients there are mentally retarded and, therefore, particularly vulnerable. In addition, DMH employees in those residential care facilities work in a closed environment, making it difficult for DMH administrators to supervise these employees on a regular basis. Defendant has also identified a specific pattern of drug abuse by DMH employees in habilitation facilities, including administrative employees. Furthermore, even though DMH has taken steps to secure its facilities, it has been unable to stop illegal drugs from getting into the hands of habilitation patients. DMH has an interest in preventing injuries to this vulnerable group, not merely responding by drug testing after an injury has occurred.

### 2. Mid-Missouri Mental Health Center and Southeast Missouri Mental Health Center

None of the three Plaintiffs work at a habilitation center. One works at Mid-Missouri Mental Health Center and two work at Southeast Missouri Mental Health Center. There is no evidence of current or past drug use by staff at these facilities. There is no evidence that the Plaintiffs have access to drugs at these facilities. There is no evidence that the Plaintiffs work in secure areas of the facilities. In fact, there is no evidence that these Plaintiffs have direct responsibility for patient care.[3] None of the factors that justify drug testing at habilitation centers applies to the Plaintiffs' work environment. On this record, it would be speculative at best for the Court to conclude

---

[3]Jakubowicz is identified as a Psychiatric Aide II. While the Court suspects he provides direct patient care, the evidence is insufficient to support a finding to that effect.

that the Plaintiffs should be randomly drug tested because they are in a safety sensitive position.

> B. **Role Model**

DMH's drug testing policy applies, on its face, to every person employed by DMH, from the Director to an accountant to a receptionist, both in and outside residential treatment centers.

Defendant Dittemore justifies including all DMH employees in its drug testing program because, according to the Department, every employee is a role model for DMH's clients. Dittemore argues that some or most of DMH's clients participate in vocational programs which require them to work in DMH facilities. He also contends that drug addicts being treated by DMH can spot a drug user better than the professional staff of DMH. Dittemore then reasons that if a client sees that a drug using employee is not punished by DMH, the client will conclude that DMH is duplicitous when it expects its clients to live a drug free life. There are a number of obvious flaws in this logic; particularly, given the record before the Court.

Dr. Vincenz did not identify a single DMH patient who had special skills at detecting prior drug use, making it impossible to test his hypothesis. Nor has Dr. Vincenz identified any testing or professional literature to support a conclusion generally that drug users are better than trained staff at identifying drug users. Dr. Vincenz's conclusions on this subject are particularly puzzling because he suggests that the special ability to discern the subtle evidence of prior drug use is possessed by family members of the addicted

16

person as well. Vincenz Dep. at p. 43. Yet, he does not explain how an untrained family member is better able to detect this subtle behavior but a trained DMH supervisor who is around drug addicts regularly is not able to discern that DMH employees are using drugs outside the workplace. Because the Court does not find persuasive Dr. Vincenz's testimony that DMH clients are better than trained staff at identifying off duty drug use by DMH employees, it rejects DMH's argument that there is a special need to randomly drug test all DMH employees, even those that do not provide patient care. If DMH's staff is as able as DMH's clients to see that a DMH employee is engaged in off duty drug use, there is no need for random testing of employees. Drug testing can be done based on an actual suspicion that an employee's drug use is changing cognition, response time, ability to make appropriate judgments; i.e., things that affect the quality of the employee's job performance.

The weight to be given to DMH's role model argument is also diminished by the fact that DMH has not instituted any screening mechanism to address other employee behaviors that might undermine DMH's treatment plan. There are no special testing measures for alcohol use. There is no evidence that people with eating disorders are investigated even if they physically exhibit their disease. It does not make sense that the role model argument would apply only to drug users.

DMH's role model argument is also undermined by its own admission that if an employee tests positive for drugs, they are not disciplined unless they refuse treatment. If no discipline is imposed, the employee would continue to work at DMH and a patient

17

with the sixth sense to detect prior drug use would not know that DMH had taken corrective procedures. Thus, under Defendant's theory, the DMH client would continue to believe that DMH was condoning drug use.

Finally, the Defendant's role model argument is dependent on Dr. Vincenz's conclusion that there are DMH patients who, because of their prior drug use, are able to identify fellow travelers better than DMH supervisors. There is no evidence in the record, however, about the Plaintiffs' work environment. There is generic testimony that DMH employees come in contact with DMH patients because of the vocational training program, but there is no evidence that these Plaintiffs have had contact with DMH clients in the vocational training program. Nor is there evidence that the Plaintiffs come in contact with patients recovering from drug addiction as opposed to other mental diseases or disabilities. Although Dr. Vincenz testified that there were many dual diagnosed patients in the system, it is impossible to determine from the record how many DMH employees had such a diagnosis, much less the number who had any demonstrable ability to identify drug use in employees that was superior to the detection skills of Plaintiffs' supervisors.

Given this record, Dittemore has failed to prove that there is a special need for random drug testing of Plaintiffs who work at Mid-Missouri Mental Health Center and Southeast Missouri Mental Health Center.

## III. Conclusion

In the end, DMH's decision to subject the Plaintiffs to random drug tests is nothing

18

Case 2:05-cv-04135-NKL   Document 59   Filed 09/12/06   Page 18 of 20

more than a "gesture or symbol" that DMH does not approve illegal drug use. The Court is unaware of any government agency that approves illegal drug use. If DMH's role model justification for agency-wide drug testing is Constitutional, then the Supreme Court has indeed wasted its time identifying the many factors that must be present before Fourth Amendment protections will be sacrificed for the special needs of the government. Every public employer has an interest in ensuring that its employees are not under the influence of illicit drugs and that they are role models for the community. Because this interest is so pervasive, if it alone were enough to justify warrantless drug testing, the Fourth Amendment's protection for public employees would be meaningless. The exception would, in the end, swallow the rule.

In *Chandler*, Georgia enacted a statute that required candidates for public office submit to drug testing before their names could be placed on the ballot. The Supreme Court struck down the provision because Georgia's only articulated basis for having the policy was the need for its public officials to serve as role models. The Court stated, "The need revealed, in short, is symbolic, not 'special,' as that term draws meaning from our case law." 520 U.S. at 322. *See also United Teachers of New Orleans v. Orleans Parish Sch. Bd.*, 142 F.3d 853 (5th Cir. 1998) (general interest in drug-free workplace insufficient to establish a special need for drug testing program for teachers).

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Permanent Injunction [Doc. # 50] is GRANTED in part and DENIED in part. DMH is permanently enjoined from randomly

19

drug testing the Plaintiffs.  Otherwise, the Plaintiffs' Motion for Permanent Injunction is denied.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

DATE:  September 12, 2006
Jefferson City, Missouri